

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO DELGADILLO, ) | NO. EDCV 04-1215-SGL |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs ) | ORDER GRANTING DEFENDANTS' MOTION |
| ) | TO DISMISS[1] |
| ) | |
| TEAMSTERS AND FOOD EMPLOYERS ) | |
| SECURITY TRUST FUND, HOSPITAL- ) | |
| MEDICAL PLAN NO. 501, JOINT ) | |
| BOARD OF TRUSTEES, BRENT R. ) | |
| BOHN, KATHLEEN A. FINAZZO, ) | |
| JOHN SCHROEDER, JIM MAHAN, ) | |
| ROBERT L. MONDER, KURT LARSEN, ) | |
| RICK MIDDLETON, and SOUTHWEST ) | |
| ADMINISTRATORS' INC., ) | |
| ) | |
| Defendants ) | |

Mario Delgadillo, a retired truck driver, challenges the denial of his application for retiree health and welfare benefits. Based on this denial, Delgadillo has filed suit against the health and welfare trust fund, the Teamsters and Food Employers Security Trust Fund ("Food Trust"), which his former employer and union agreed to establish in a collective bargaining agreement, the retiree health benefits plan itself, Hospital-Medical Plan No. 501 ("Retiree Health

---

[1] Both parties consented in writing to proceed before this Court.

Plan" or "Plan"), the Joint Board of Trustees ("Board") for the Food Trust, the Board's individual trustees (collectively referred to as "Trustees"), and the Plan's third-party administrator, Southwest Administrators, Inc ("Southwest") His complaint sets forth five causes of action (1) Recovery of retiree health and welfare benefits to which he is entitled, (2) breach of fiduciary duty for interpreting the Plan's provision in an arbitrary manner to deny him those benefits, (3) declaratory judgment that he is entitled to such benefits, (4) equitably estop defendants from interpreting the Plan terms to deny him retiree health and welfare benefits given the oral representations made to him by various union officials over the years respecting the same, and (5) failure to furnish requested information Defendants now seek the dismissal of all of Delgadillo's claims For the reasons set forth below, defendants' motion to dismiss is **GRANTED**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint See FED R CIV P 12(b)(6) Dismissal is proper only where the complaint presents a claim that lacks any cognizable legal theory or fails to present sufficient facts to support the claim under a cognizable legal theory See Balistreri v Pacifica Police Dept , 901 F 2d 696, 699 (9th Cir 1988) In resolving a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the complaint, construing them in the light most favorable to the plaintiff See Winn v Killian, 307 F 3d 1011, 1014 n 1 (9th Cir 2002), Zimmerman v City of Oakland, 255 F 3d 734, 737 (9th Cir 2001)

Normally "review is limited to the [factual allegations set

forth in the] complaint" when deciding a motion to dismiss Lee v. City of Los Angeles, 250 F 3d 668, 688 (9th Cir 2001) Courts can, however, in certain circumstances also look to extrinsic evidence without converting a Rule 12(b)(6) motion into one for summary judgment Id Documents that are "physically attached to the complaint," whose "authenticity is not contested and the plaintiff's complaint necessarily relies on them," or that are "matters of public record" may be considered Id at 688-89, see also FED R CIV P 10(c), Parrino v FHP, Inc., 146 F 3d 699, 706 (9th Cir 1998)(noting that district court can consider documents not attached to complaint whose authenticity is not contested and upon which the plaintiff's complaint necessarily relies), Branch v Tunnell, 14 F 3d 449, 454 (9th Cir 1994)("documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered") Towards that end, the Court has looked to the documents attached to defendants' motion to dismiss in fleshing out the factual allegations at issue in this case as those documents are necessarily referenced by either the allegations contained in or the documents attached to the complaint and their authenticity is not seriously in question

Applying the above standard of review to this case, the following allegations have been taken as true[2]

---

[2] The Court notes that the complaint is not a model of clarity It contains multiple internal inconsistencies For example, an exhibit attached to the complaint states Delgadillo was "terminated" in 1999 - a term also used in the complaint - but elsewhere it is alleged that Delgadillo "formally retired" in 1999 Giving Delgadillo the benefit of the doubt (although it is not clear he is even entitled to such a benefit on a motion to

In November, 1969, Delgadillo became employed with Lucky Stores, Inc ("Lucky's"), as a truck driver  In conjunction with his employment at Lucky's, Delgadillo also became a member of Teamsters Local No 952 ("union")  As is standard in the employment setting, Lucky's (and later its successor Albertson's), in a collective bargaining agreement reached with the union, agreed to offer its employees a package of benefits, including pension benefits and retiree health and welfare benefits  During his employment at Lucky's, Delgadillo was made various "promises" from union representatives that if he worked for a long enough period of time as a Teamster he was guaranteed health insurance coverage for life upon retirement

---

dismiss, see Sprewell v Golden State Warriors, 266 F 3d 979, 988 (9th Cir. 2001)("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit"), the Court has accepted as true those allegations in the complaint most beneficial to his claims despite the existence of contrary allegations within the complaint itself

Moreover, the Court notes that there are a number of factual "gaps" in the complaint, be they inadvertent or intentional, that have led to some confusion as to the procedural posture of this case  For instance, the complaint makes mention of Delgadillo's July, 2003, application for "retirement benefits," but the very next sentence in the complaint seamlessly transitions to the defendants' 2004 denial of his application for "health and welfare benefits "  Without careful attention, the reader may have conflated the 2004 health benefit denial as being in response to the July, 2003, pension application  There is no mention in the complaint of what happened as a result of Delgadillo's 2003 pension application  The Court was only able to piece that bit of information together by reference to the document attached to the complaint wherein the defendants note in their 2004 response to Delgadillo's <u>health and welfare</u> benefit application that his <u>pension</u> benefits became effective May, 2003  From this the Court inferred that at some point after July, 2003, the Pension Trust awarded Delgadillo pension benefits in response to his July, 2003, application.

In or about June or July 1996, Delgadillo was injured on the job, sustaining a knee injury when he lifted a door out of a truck and injured his knee, which resulted in his placement on disability At that time, Delgadillo was interested in retiring and applied for pension benefits by making an application through one of the Local No 952 union officers He received a response letter from the Western Conference Teamsters Pension Trust ("Pension Trust") on January 29, 1997. The letter specifically stated. "This is to acknowledge receipt of your request for pension information " This was the only response Delgadillo received about his application for pension benefits

In the interim, Delgadillo remained on disability until he apparently returned to work sometime in 1997 Later, in July, 1997, he injured his other knee when pallets fell on it After the second accident, Delgadillo was placed on a leave of absence Delgadillo thereafter applied for worker's compensation benefits During the period of time that his worker's compensation claim was open and he was on disability/leave of absence, Lucky's continued to make contributions in his name for pension benefits to the Pension Trust and for retiree health and welfare benefits to the Food Trust

Delgadillo's last day of work with Lucky's was on January 8, 1998, but his official termination date was not until June 16, 1999 The employer's explanation for the discrepancy between the two dates was that Delgadillo was "on leave of absence" during the intervening period Delgadillo thereafter "formally retired" in June, 1999 Sometime in 1999 or 2000, Delgadillo again applied for pension benefits with the Pension Trust, but his application went ignored

On or about July 10, 2003, Delgadillo, with the assistance of

counsel, made an application for pension benefits with the Pension Trust. Sometime thereafter he was awarded pension benefits with an effective date of May, 2003. Also sometime during 2003 or 2004, Delgadillo applied for retiree health and welfare benefits from the Food Trust.

On May 19, 2004, Delgadillo received a rejection letter from either Southwest or the Board, regarding his application for retiree health and welfare benefits. The letter stated:

> Following a review of your case, it was the decision of the Trustees to deny your appeal on the basis of the Plan's Retiree Eligibility Rules as stated on page 48 of the Summary Plan Description. The Trust Fund requires employees to be eligible for [health] benefits for 24 out of the 36 months *immediately* preceding commencement of pension benefits under the Western Conference of Teamsters Pension Plan. Our records indicate that you have not had health and welfare eligibility since December 1998, and your pension benefit became effective May 1, 2003, as a result, you did not qualify for the health and welfare benefits under this Trust.

On September 1, 2004, Delgadillo's counsel sent a written request to "Southwest Area Administrative Offices - Western Conference of Teamsters Pension Plan" for a number of documents, including summary plan descriptions, annual financial reports, and other documents relating to his pension plan and retiree health benefit plan. The letter began with the introductory salutation "Dear Pension Department," and concluded with the remark, "I understand that the pension trust may make a reasonable charge for copies of some of the above-named documents."

On September 24, 2004, Delgadillo's counsel received the following response from a representative for the Pension Trust: "[E]nclosed are the documents pertaining to the Western Conference

6

of Teamsters Pension Trust  The remaining pertaining to the [Food Trust] has been forwarded to that trust for a response " There is no allegation that the Food Trust, the Board, or the Plan ever received the forwarded request for documents, or, if so, when receipt of the forwarded request occurred

Six days later, on September 30, 2004, Delgadillo filed the present complaint with this Court  The complaint was later amended on November 14, 2004, to include the failure to furnish requested information claim

## II. ANALYSIS

A.  Denial of Retiree Health Benefits

The central provision in the Retiree Health Plan relevant to this case is contained on page 48 of the summary plan description

> WHO IS ELIGIBLE
>
> Retired Employees of participating Employers and their Dependents are eligible for benefits under the Retired Employee Benefit Programs only if all of the following conditions have been met.
>
> **You are eligible as a Retired Employee if:**
>
> 1   You were employed at least five (5) years in the Food Industry and were eligible for benefits under the Active Employee Benefit Programs of the Teamsters and Food Employers Security Trust Fund for at least twenty-four (24) months of the thirty-six (36) months immediately preceding commencement of your retirement benefit under the Western Conference of Teamsters Pension Plan, and
>
> 2   You were last employed under a collective bargaining agreement which required your participating Employer to make contributions to the Retiree Plan on your behalf, and
>
> 3   Your last Employer is currently making contributions to the Retiree Plan under the collective bargaining agreement under which

          you were last employed or a successor collective bargaining agreement covering the same bargaining unit, and

    4     You are eligible for a pension benefit from the Western Conference of Teamsters Pension Plan or another plan approved by the Board of Trustees, and the effective date of your first monthly pension benefit is within twelve (12) months of your retirement

The Plan document itself provides that eligibility for retiree health and welfare benefits is contingent on the retiree having been "employ[ed for] at least five (5) years in the Food Industry and cover[ed] under the Plan as an active Employee by reason of Employer Contributions     for at least twenty-four (24) of the thirty-six (36) months immediately preceding commencement date of the Employee's retirement benefit under the Western Conference of Teamsters Pension Trust " Likewise, the collective bargaining agreement that established the Food Trust similarly provided that an employee's eligibility for retiree health and welfare benefits was keyed to those "who immediately prior to their retirement were employed at least five (5) years in the Food Industry and     was   eligible under the Health and Welfare Plan as an active employee for not less than twenty-four (24) months of active coverage . .   during the thirty-six (36) months immediately preceding the employee's retirement date "

The plan provisions clearly establish the existence of three elements for a retiree to qualify for health and welfare benefits

One, the retiree must have worked for more than five years in the Food Industry, no one disputes that Delgadillo met this requirement as he worked as a Lucky's truck driver for thirty years

Two, the retiree, when he was an active employee (hence, the

Plan's call that the retiree was eligible "under the <u>Active Employee Benefit Program</u>"), was eligible for pension benefits, again no one disputes this point.[3]

And three, that the retiree was eligible, again as an active employee, for pension benefits for at least 2 of the 3 years immediately proceeding commencement of his pension benefits. It is this last qualification that divides the parties.

The Board ruled that Delgadillo's commencement of pension benefits took place when those benefits became effective, that is, on May 1, 2003. The Board therefore equated the effective date of a retiree's pension benefits with when those pension benefits commenced. On that score Delgadillo had not been eligible as an active employee for 2 out of the 3 years immediately preceding that point. According to the complaint, Delgadillo's last day of work was in 1998, his termination date was in 1999, and he retired in 1999 -- all of those dates occurring well outside the 2 out of 3-year period prior to when the pension benefits were effective.

Delgadillo, on the other hand, argues that his pension benefits commenced when he first applied for them in 1996 and/or 1999, at either of which times he had been eligible as an active employee for the entire three years preceding those applications. According to Delgadillo, a retiree's pension benefits commences whenever he or she applies for those benefits regardless of whether that application is the most recent one. Thus, according to Delgadillo, the Food Trust should have granted him retiree health and welfare

---

[3] Moreover, Delgadillo's counsel conceded during oral argument that his client's eligibility as an active employee ended, even with possible extensions for disability and leaves of absence, well before 2003.

benefits because he made applications for pension benefits in 1996 and 1999 which, though not processed, were submitted at a time when he was eligible to receive pension benefits under the active employee benefit program for 24 out of 36 months immediately preceding those applications. In doing so, Delgadillo essentially posits that the Board, when it processed his retiree health and welfare benefit application sometime in 2003 or 2004, should have either ignored the four-year gap between the last time he actively participated in the Plan in any fashion and when his pension benefits became effective in May, 2003, or the Board should have deemed his 1996 or 1999 applications as the time when his pension benefits commenced. Delgadillo did concede at oral argument that, if measured from his 2003 pension application, he would not meet the thirty-six months active employee qualifying period.

In actions under 29 U.S.C. § 1132(a)(1)(B) to challenge the denial of benefits based on a plan administrator's interpretation of a plan, the court must review for abuse of discretion the benefits decisions of plan administrators to whom the plan grants "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). In this case, the summary plan description for the Retiree Health Plan grants the Board discretion to construe the terms of the Plan because it provides that in any "dispute as to eligibility, type, amount or duration of benefits, the dispute shall be resolved by the Board in their absolute discretion under and pursuant to the Plan," and that the same applied to the Board's "interpretation of the Plan." The Ninth Circuit has construed comparable language in other plan provisions

to confer interpretative discretion.[4]  See Canseco v. Construction Laborers Pension Trust, 93 F.3d 600, 605 (9th Cir. 1996).

A key principle guiding resolution of benefits claims under ERISA is for the court to look to the plain language of the plan instrument to determine whether the administrator's interpretation of the plan was "arbitrary and capricious." "[T]rustees abuse their discretion if they . . . construe provisions of a plan in a way that clearly conflicts with the plain language of the plan." Johnson v. Trustees of the Western Conf. of Teamsters Pension Trust Fund, 879 F.2d 651, 654 (9th Cir. 1989). The question that must be asked in resolving benefit claim disputes is not "whose interpretation of the plan documents is most persuasive, but whether the administrator's interpretation is unreasonable." Winters v. Costco Wholesale Corp.,

---

[4] Delgadillo, while acknowledging that the summary plan description terms convey discretion to the Board's interpretation of the plan provisions, argues that the Court should nonetheless employ a de novo standard of review because the Board suffers from an inherent conflict of interest in interpreting the Plan's provisions. As Delgadillo frames his argument: "[T]he Trust Fund is administered by a Joint Board of Trustees. There are a total of seven trustees . . . 5 who represent the employer group and 2 who represent the union group . . . Trust Fund is so one-sided in representing the employer's interest, the 'token' vote of the Union trustees have little effect upon the ultimate decision to grant or deny benefits. Therefore, it is inherently conflicted when the employers control the Trust Fund based solely upon the sheer number of votes." (Pl's Opp at 10, 11). His concern for a conflict of interest based on the numerical advantage the employers has in terms of Board representation is illusory. The Trust Agreement explicitly provides that "[i]n determination of all matters coming before the Board of Trustees . . . voting power shall at all times be equal between the Union Trustees and the Employer Trustees. The Union Trustees shall collectively cast a single unit vote and the Employer Trustees shall collectively cast a single unit vote." (Defs' Reply, Ex. 1 at 15). As the individual trustee's named by the employer have equal voting power to those named by the union, Delgadillo's argument is not well-founded.

49 F.3d 550, 553 (9th Cir. 1995). When do pension benefits commence under the Plan, or at least, was it reasonable to interpret the commencement of pension benefits as being the pension benefits' effective date?

The Court finds that the Board's interpretation is a reasonable one. First, the words in the plan provision in question itself are readily susceptible to the interpretation given to it by the Board. The plan provision states that the retiree must have been eligible as an active employee for 2 out of the 3 years "immediately preceding commencement of your retirement benefits." Commence means to begin. See MERRIAM-WEBSTER'S COLLEGIATE Dictionary 230 (10th ed. 1999)("to enter upon. Begin, 1. to have or make a beginning. Start"). It is only natural, from a purely linguistic prospective, to envision one's benefits as beginning from the time they began to accrue, that is, their effective date. After all, the first benefit check that is cut for the recipient uses the benefits accrual or effective date to gauge the dollar amounts involved. If one's benefits commenced earlier than their accrual or effective date, as is possible under Delgadillo's focus on the date any application (not necessarily the most recent) is filed, it is hard to imagine why the first check cut to honor that obligation would use an entirely different method, that includes use of a much shorter time period, for gauging the same. Indeed, Delgadillo's counsel acknowledges the Board's interpretation as being in keeping with the plain meaning of the plan terms when he describes their conclusion as being an overly "literal interpretation." (Pl's Opp. at 5)

Next, another provision in the summary plan description concerning eligibility also points in the direction of the retiree's

1  pension benefits effective date, not the application date, as the
2  crucial event. Qualifying item number 4 on page 48 of the summary
3  plan description itself requires that the retiree be eligible for
4  pension benefits <u>and</u> that the <u>effective date</u> for those pension
5  benefits occur within twelve months of the retiree's retirement.
6  That is, the fourth qualification allows for the same one year grace
7  period contained in the first qualification (2 out of the 3 years
8  immediately preceding commencement of retirement benefits) at issue
9  in this case, and goes on to make explicit that this one year grace
10 period is measured by or commences with the effective date of the
11 retiree's "first monthly pension benefit." Under qualifying item
12 number 4, the date a retiree applied for pension benefits has no
13 bearing on the date that retiree became eligible for pension
14 benefits. In other words, the Board's reading of commencement of
15 retirement benefits is in keeping with another provision respecting
16 a retiree's eligibility for health and welfare benefits that is also
17 expressly conditioned on the retiree's pension benefits. If another
18 part of the plan looks to the pension benefits effective date when
19 considering a retiree's eligibility for health and welfare benefits,
20 it is odd that another provision would look to entirely different
21 criteria - the application date - <u>viz</u> via the retiree's pension
22 benefits in determining the retiree's eligibility for health and
23 welfare benefits. Plan provisions are to be interpreted as a whole.
24 See <u>Canseco</u>, 93 F.3d at 606-07. The Board's interpretation
25 harmonizes these two eligibility provisions without creating the
26 potential for conflict.
27      Similarly other parts of the summary plan description that
28 reference the retiree's pension benefits also focus on the same

triggering event as the Board did in this case. For example, the section in the summary plan description concerning the start date for a retiree's health and welfare benefits states that "coverage for benefits begins on the effective date of your first pension benefit from the Western Conference of Teamsters." That is, coverage dates for retiree health and welfare benefits are tied by the plan to start, or be effective, at the same time a retiree's pension benefits begin. The purpose behind such a linkage in dates is obvious - to ensure that the full panoply of retirement benefits, both pension and health and welfare benefits, are available to an employee the moment that employee can and does retire. Such a purpose is well-served if eligibility for health and welfare benefits is measured as of the time of the pension benefits' effective date. At that point, the employee would have retired and be in need of retiree health and welfare benefits. With eligibility and coverage tied together there is less of a chance of gaps existing between when a retiree is eligible to start receiving benefits and when coverage for such benefits begins. An interpretation of the plan terms that is in keeping with the overall purpose or structure of the plan also buttresses the reasonableness of that interpretation. See Canseco, 93 F.3d at 607 (noting that "the structure of the CLPT plan reinforces our conclusion that the plan does not require an application as a condition of eligibility").

In that same vein, the master plan document itself and the collective bargaining agreement which established the trust both refer to the effective date of the retiree's pension benefits as determinative for qualification for retiree health and welfare

benefits. The plan document speaks of a "commencement date," that is, the start date, for the pension benefits and the collective bargaining agreement refers to it as the "employee's retirement date."

Although not determinative to the decision in this case, the Court further notes that all Delgadillo's complaint brings to the analysis is nothing more than a possible alternative interpretation of the Plan provisions, and even then, not a very persuasive one. The Plan provisions could not be any clearer - to be eligible for retiree health and welfare benefits the retiree must have been eligible, as an active employee, for pension benefits for 2 of the 3 years "immediately preceding commencement of [his pension] benefits." The Board, in its denial letter, interpreted commencement as being his pension benefits' effective date, in Delgadillo's case May 1, 2003. Delgadillo's argument would push the commencement of benefits to whenever a retiree applied for benefits, even when that application was never acted upon and, therefore, under the ERISA regulations in force at the time, was "deemed denied." See 29 C.F.R. §§ 2560.503-1(h)(1999).[5] It is

---

[5] The Court refers to the Code of Federal Regulations as of 1999, the last year Delgadillo filed a pension application that went ignored. The pertinent regulation, 29 C.F.R. § 2560, first promulgated in 1977, was amended in 2000. See Pension and Welfare Benefits Administration, 65 Fed. Reg. 70,246 (Nov. 21, 2000). The alterations apply to claims filed on or after January 1, 2002, well after the pertinent applications at issue in this case. 29 C.F.R. § 2560.503-1(o)(2002). The new regulation shortened from sixty days to forty-five the time allowed for initial responses to appeals from denials of benefits. 29 C.F.R. § 2560.503-1(i)(3)(i)(2002). Excised from the new regulation is the provision that transgressions of time limitations will result in the claim being "deemed denied." See 29 C.F.R. § 2560.503-1(h)(2002).

counterintuitive, nay illogical, to believe that a retiree's pension benefits commenced from the time he unsuccessfully applied for pension benefits, yet that is the interpretation Delgadillo posits as being the "reasonable" one for the Board to have drawn in his case. Even more problematic for Delgadillo's position is that it allows for, and in his case relies on, older applications to extend the eligibility life of a retiree's health and welfare benefits even when there have been intervening applications that have been filed. Nowhere does Delgadillo give any limiting principle as to how old an application must be before it would no longer qualify as commencing a retiree's benefits. Nothing in the Plan terms remotely provide any linguistic room to allow for such a possibility. The Plan terms speak of a single, fixed commencement date without any qualifications, caveats, or otherwise identifying a factor-based continuum for adjudging that date's existence.

     Further undercutting Delgadillo's challenge to the reasonableness of the Board's interpretation is what the Pension Trust believed to be the time under its plan that Delgadillo was entitled to pension benefits - May 1, 2003, approximately two months prior to his application for those pension benefits. Thus, not only did the Board interpret Delgadillo's pension benefits as commencing sometime well after he actively participated in the pension plan, but so did the Pension Trust. If his benefits commenced, that is, begin, when he applied for them in 1996 or 1999, why did the Pension Trust conclude that they began at some point well after that? There is no indication in the complaint that Delgadillo has challenged the

Pension Trust's determination of the effective date of his pension benefits.

Finally, his interpretation is also particularly unreasonable as it allows for the possibility of an employee's pension benefits "commencing" before the employee actually retires. If the employee applies for pension benefits before retiring, under Delgadillo's interpretation, that employee's pension benefits commenced, that is, began, on the application's date even if the employee did not even meet the age or duration of employment requirements to be paid, or even qualify, for such benefits at that time. Such an interpretation is not in keeping with the rest of the plan's structure that places emphasis on the pension benefits' effective date.

Given that the Board's interpretation fits hand in glove with the plain terms of the Plan language as well as with other provisions in the plan documents, the Court finds that its' interpretation of the Plan to deny Delgadillo retiree health and welfare benefits was a reasonable one, and, hence, did not constitute an abuse of discretion.

B.   Remaining Claims

Given the Court's finding above, Delgadillo's breach of fiduciary duty and declaratory judgment claims necessarily fail as they are derivative of his claim that the denial of his retiree health and welfare benefit claim was wrongful. Delgadillo's arguments that the defendants should be estopped from interpreting the plan to deny him health and welfare benefits because of the representations made to him over the years by union representatives fails given the Court's finding that the plan terms were not

ambiguous.  See <u>Bolton v. Construction Laborers Pension Trust for Southern California</u>, 56 F.3d 1055, 1059 (9th Cir. 1995)("Among other requirements for the Plan to be equitably estopped are that the Plan's break-in-service provision be 'ambiguous such that reasonable persons could disagree as to its meaning or effect'").  Finally, his failure to furnish information claim is defective as there is nothing in the complaint indicating that the defendants, as opposed to the Pension Trust, who were the plan administrators for the Food Trust ever received his request for information.  See <u>Averhart v. US West, Inc.</u>, 46 F.3d 1480, 1489 (10th Cir. 1989)(plan administrator liable for failure to furnish requested information).

### III. CONCLUSION

Accordingly, defendants' motion to dismiss is GRANTED and the case is dismissed with prejudice.

DATED  <u>3-15-05</u>

_/s/ S. Larson_
STEPHEN G. LARSON
UNITED STATES MAGISTRATE JUDGE

18